FILED
HARRISBURG, PA
SEP 2 2 2014

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **Crim. No. 1:12-CR-267** |
| **v.** | : | |
| | : | |
| | : | **Judge Sylvia H. Rambo** |
| **DARIUSZ PRUGAR** | : | |

## M E M O R A N D U M

Defendant pled guilty to intentionally causing damage without authorization to a protected computer, in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(5)(A), based on an intrusion into his former employer's protected computer system after he was terminated from his position. Prior to sentencing, Defendant moved to withdraw his guilty plea primarily on the basis that he did not knowingly and voluntarily enter the plea because he was suffering from undiagnosed Bipolar II Disorder at the time of the plea hearing. (Doc. 38.) For the reasons that follow, the court will deny Defendant's motion to withdraw his guilty plea.

### I.        **Background**

Because the court writes solely for the parties, it will recount only those facts necessary for its disposition of the matter *sub judice*.

Defendant, Dariusz A. Prugar ("Defendant"), was indicted on October 17, 2012 (Doc. 1), in a three count indictment.[1]  He was charged with intentionally

---

[1] On June 2, 2011, the United States Attorney sent Defendant a "target" letter, advising him that he was a target of a federal criminal investigation considering whether he may have violated federal

(continued...)

causing damage without authorization to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A); wire fraud, in violation 18 U.S.C. § 134; and Hobbs Act extortion, in violation of § 18 U.S.C. § 1951. (*Id.*)  Defendant initially pled not guilty to the charges on October 23, 2012. (Doc. 11.)  However, through a negotiated plea agreement, Defendant agreed to enter a plea of guilty as to Count I for intentional damage to a protected computer, and the government agreed to dismiss the charges of wire fraud and extortion. (Doc. 25.)

### A.    Change of Plea Proceeding

On February 19, 2013, the court held a change of plea proceeding, during which Defendant entered a guilty plea pursuant to a written agreement. (Doc. 29.)  At the proceeding, the court inquired into Defendant's mental health history as well as his current well-being, and Defendant disclosed that he took Adderall, a medication typically prescribed for attention deficit hyperactivity disorder ("ADHD"), and an anti-anxiety medication. (*See* Doc. 40, p. 3 of 15.)  The court further inquired as to whether he was undergoing any psychological or psychiatric counseling, and Defendant reported that he underwent counseling every other week. (*Id.*)  Defendant clearly stated to the court that he fully understood what was taking place that day and that the medication was not affecting his ability to understand the proceedings. (*Id.*)

---

[1] (...continued)
criminal laws, including 18 U.S.C. § 1030, computer hacking. (Doc. 50, p. 1 of 2.)  The letter provided Defendant with the opportunity to resolve the case prior to its presentation to the grand jury. (*Id.*)  However, pre-indictment negotiations failed to resolve the case.

Satisfied that he understood the nature of the proceedings before him, the court then advised Defendant of the constitutional rights he was waiving by virtue of pleading guilty, as follows:

> [U]nder the law, you are entitled to persist in a not guilty plea and proceed to a jury trial in this matter. At a jury trial, you and counsel would select a jury consisting of 12 persons. At that trial, the Government would have the responsibility of proving each and every element of the crime charged against you beyond a reasonable doubt. You are presumed innocent until that burden is met.
>
> At a trial, you would have the right to cross-examine any witnesses the Government would present or the right to subpoena witnesses and evidence on your own behalf although you are not required to do so. Any finding of guilt by a jury would have to be unanimous; that is, all 12 jurors would have to agree. If you give up your right to a jury trial, you give up your right to present any defenses that you may have or the right to appeal any pretrial motions.

(*Id.* at pp. 4-5 of 15.) After advising him of his rights, the court asked Defendant if he understood his right to a jury trial in this matter, to which Defendant answered in the affirmative. (*Id.* at p. 5 of 15.) The court then asked, "Is it your desire to give up that right to a jury trial and enter a plea of guilty to the charges?" (*Id.*) Defendant answered, "It is." (*Id.*)

Thereafter, the prosecutor provided the essence of the plea agreement, stating, in pertinent part, that "Defendant is going to face a maximum punishment of 10 years incarceration, a maximum fine of $250,000, a term of supervised release, as well as a $100.00 special assessment." (*Id.*) Defendant twice stated that he understood the maximum penalty under the plea agreement. (*See id.* at p. 6 of 15.) When asked if he had reviewed "each and every paragraph in [the] plea agreement with [his] counsel," Defendant responded that he had. (*Id.* at p. 8 of 15.)

3

The prosecutor then reviewed the factual basis that the Government would present at trial in support of Count I as follows:

> The Defendant was employed as a programmer for [a computer services business ("the Business")], which is an information technology business located in Enola, Pennsylvania.
>
> [The Business] provides a number of computer technology services, including managing an Internet service provider [("the Online Service")] . . . . In late June of 2010, after a series of personnel issues with [Defendant], the Defendant was terminated from his position at [the Business]. . . . In the days following his termination, [the Business] noticed that their web service and other computer functions began to crash. For approximately a week, their system was substantially inoperable. [The Business] had to contract with outside contractors and other individuals to rebuild their system.
>
> As a result of [the] system being compromised or being rendered inoperable, [the Online Service] customers as well as other customers of [the Business] were unable to access their Internet and e-mail services, and businesses which used these services for their internal operations were unable to perform their various business functions that they had contracted [the Business] and/or [the Online Service] to perform.
>
> It was estimated [that] approximately 10,000 e-mail accounts and over 300 customers were unable to utilize their services during the interruption period. Some of the customers were involved in the transportation of hazardous materials as well as the online distribution of pharmaceuticals.
>
> During this interruption period, [the Business'] employees contacted [Defendant] by telephone and sought his assistance. [Defendant] had served as a programmer for the system [and] was the keeper of many of the codes to the various components of the computer system. The [Business'] employees contacted [Defendant] to seek his assistance to help stem the systematic compromise which was going on.
>
> In those calls, the Defendant acknowledged that he had these codes and that he could assist the [Business']

4

programmers in restructuring their system. However, he requested that certain scripts and/or software programs which he believed he had a proprietary interest in as well as computer materials be returned to him in exchange for his assistance.

They were unable to reach a resolution between [the Business] and [Defendant]. Local authorities, and ultimately the FBI, were called in. Agents conducted an investigation and interviewed [Defendant]. [Defendant] confessed to the agents that he had entered the system through entry points in attempts to gather some information which he believed belonged to him, and while he was in the system, he had erased certain scripts or codes from the system.

It was this unlawful entry that the investigation revealed caused the network's damage. [The Business] lost multiple customers as a result of this outage, and the damage was in excess of $5,000.00.

(*Id.* at pp. 9-11 of 15.)

In response to the Government's review of the facts underlying the plea, the court inquired of Defendant whether he agreed with the facts as recited. Specifically, the court and Defendant engaged in the following exchange:

The Court: Were you employed by [the Business] at some point in time?

Defendant: Yes, I was.

The Court: And you had access to computer information of the [B]usiness['] users?

Defendant: Yes, I did.

The Court: And you were eventually terminated by this company?

Defendant: That's correct.

The Court: And through computer program information, code[,] and command, you were able to access the [B]usiness['] computer network?

5

Defendant:      That's also correct.

The Court:      And you were able to alter computer programs or scripts?

Defendant:      Alterations never occurred, but file deletions of certain log files, yes.

The Court:      And do you agree that these protected customers had damage caused to their systems?

Defense Counsel: Your honor, if I may?  What we agree is that the [Business'] server had damage that was caused.  At issue in this matter, Your Honor, is the extent of the damage, what damage was particularly caused by [Defendant], the number of folks that were damaged, and whether or not they would qualify as critical infrastructure.

So to the extent that [Defendant] has said, yes, absolutely he had entered it, he had no business to do so, it was a protected computer, he acknowledges that damage was caused through his actions.  Is that correct, [Defendant], that you would stipulate those are true and correct facts?

Defendant:      That is true and correct.

Court:          Does he understand that these computers, the use of these computers does involve interstate commerce?

Defense Counsel:  He does, Your Honor.

The Court:      And there's also an allegation that the [B]usiness['] computer network had damage in excess of $5,000.00.

Defense Counsel:  He would – he has no objection it was likely in excess of $5,000.00.  It is how much larger that is at issue.

| The Court: | Is there likely a need for a hearing on damage? |
|---|---|
| Prosecutor: | There may be a hearing on damage as well as other sentencing factors. |
| The Court: | Okay. Otherwise, do you substantially agree with the facts as set forth by [the Government] in this matter? |
| Defendant: | Yes, I do. |

(*Id.* at pp. 11-13 of 15.)

At the close of the hearing, the court accepted Defendant's guilty plea, having found that it was knowingly and voluntarily entered, had a basis in fact, and contained all the elements of the crime charged. (*Id.* at pp. 13-14 of 15.)

### B.    Presentence Investigation Report

On July 31, 2013, a United States Probation Officer prepared a presentence investigation report, in which he found, *inter alia*: a loss amount between $200,000 and $400,000; over 50 victims; use of sophisticated means; and damage to critical infrastructure. The probation officer thereby calculated Defendant's total offense level to be 29 and his criminal history category to be I, yielding a sentencing guideline range of 87 to 108 months. Defendant filed objections to the report on November 25, 2013.

### B.    Motion to Withdraw Guilty Plea

On June 16, 2014, Defendant, through new counsel, filed a motion to withdraw his guilty plea (Doc. 38) and brief in support (Doc. 39). The motion is primarily based on a claim that he did not knowingly and voluntarily plead guilty, and, further, that he is innocent of the charge. In his brief, Defendant explains that, prior to his arrest, he was being treated for a variety of mental health issues and had

7

been diagnosed with obsessive compulsive disorder ("OCD"), panic disorder, and ADHD. (Doc. 39, p. 2 of 7.) As a result of these diagnoses, Defendant was prescribed Ativan, Adderall, and Ambien. (*Id.*) However, subsequent to changing his plea to guilty, Defendant was diagnosed with Bipolar II Disorder, for which he was prescribed Lamictal. (*Id.*) After diagnosis and treatment, Defendant claims that he began to exhibit marked improvement in functioning. (*Id.*) In support of his arguments, Defendant attached medical records from his treating psychiatrist, Dr. Anil K. Verma, M.D. ("Dr. Verma"), which show that Defendant was, in fact, diagnosed with Bipolar II Disorder after he pled guilty and that Defendant reported significant improvement after being prescribed Lamictal. (*See* Doc. 39-1, pp. 10-11 of 17.)

Defendant also argues that he is innocent to the charge to which he pled guilty, explaining that:

> At the time he changed his plea to guilty, [he] was unaware of an important defense available to him as to the charge to which he pleaded guilty; namely[,] that the actions which he admittedly undertook may not have caused the harm which they were alleged to have caused. Thus, [he] was unaware of his actual innocence at the time of his plea. While [he] admits to taking certain actions alleged, he now has knowledge that those actions do not support a conviction for [a] violation of 18 U.S.C. § 1030(a)(5).

(Doc. 39 at p. 4 of 7.)

On June 30, 2014, the Government filed a response in opposition to Defendant's motion to withdraw his guilty plea. (Doc. 41.) The Government argues that the plea proceeding demonstrated that Defendant entered his plea knowingly and voluntarily, and that he pled guilty to all of the elements of the charged offense. (*Id.* at pp. 12-13 of 21.) As to his mental health diagnosis, the Government contends

8

that Dr. Verma's records "reflect a functioning, employed individual who is capable of making significant decisions in life." (*Id.* at pp. 16-17 of 21.)  For example, on June 17, 2012, Dr. Verma observed that Defendant's "attitude/behavior was neutral" and his "mood was congruent with the issues and circumstances of the evaluation." (*Id.* (citing Doc. 39-1, p. 4 of 17).)  On July 23, 2012, Dr. Verma noted that Defendant had traveled to Austin, Texas for several weeks for work (*id.* (citing Doc. 39-1, p. 6 of 17)), and, on September 19, 2012, Defendant reported that the combination of therapy and medication was extremely helpful (*id.* (citing Doc. 39-1, p. 6 of 17)).  Two months after Defendant entered his guilty plea, Dr. Verma noted that Defendant "ha[d] been doing extremely well."  (*Id.* (citing Doc. 39-2, p. 8 of 17).)  The Government argues that, while the medical records indicate that Defendant was diagnosed with Bipolar II Disorder on October 3, 2013 – nearly six months after his guilty plea – and that he began to experience improvement following the diagnosis, there is no indication that he was suffering from the condition at the time of his plea nor that it had any impact on the entry of his plea. (*Id.* at pp. 18-19 of 21.)

As to his claim of innocence, the Government argues that Defendant has admitted his guilt to all of the elements of the crime.  Specifically, Defendant admitted to "remotely accessing a protected computer without authority and erasing scripts," and does not contest that he caused damage, *i.e.*, "the erasing of scripts." (*Id.* at pp. 13-14 of 21.)  While Defendant and his counsel noted during the change of plea proceedings that they were contesting the amount of loss and the status of the computers as part of critical infrastructure, Defendant conceded that the loss involved was in excess of $5,000 for purposes of a felony offense under 18 U.S.C. §

1030(a)(5)(A).  (*Id.* at p. 14 of 21.)  Further, the Government submits that, as a computer programmer and designer of the Business' network, Defendant had more than sufficient information to make "an informed decision that there was harm caused by his actions and he was guilty."  (*Id.* at p. 15 of 21.)

The Government attached numerous exhibits to their brief, including two statements that Defendant gave to the FBI.  In his July 8, 2010 statement, Defendant acknowledged that he understood at the time of his termination that he was no longer authorized to access any of the Business' computer systems.  (Doc. 43, Ex. A.)  However, after being terminated, he decided to retrieve the "scripts," or software code, that he had written and stored on the Business' servers because he "would hate to have to redo them" at his next job.  Defendant then recounted in detail the commands he issued to the Business' servers in order to retrieve those scripts and to delete the record of the commands he had just executed on the system. For example, after locating and copying the scripts from the server to his computer, he ran the commands "rm .history_bash" and "rm history.c" to delete the record. He also explained that, in order to "cover his 'tracks,'" he installed a "web based notepad" and created a "CRON job script" to delete all log files every minute.  He further stated that, "every action he took was meant with 'good intentions. . . .  He had no reason to delete the files, he just 'wanted to erase all tracks.'"  Upon being notified by employees of the Business that it was experiencing network issues, he told them that he had nothing to do with it.  However, when they asked him to provide certain network passwords that only he knew, he refused to divulge them because he wanted "leverage" in order to retrieve what he considered his personal property.

10

Likewise, in a written statement dated July 7, 2010, Defendant stated, in pertinent part, as follows:

> [F]ollowing my termination from the [Business], I gained unauthorized access into the computer network of that company in an effort to retrieve certain computer scripts that I had written and believe belong to me. I gained unauthorized access to many of the company servers and issued commands to the servers to stop logging functions and delete log files. I did this to cover up the fact that I had gained unauthorized access because I knew I was wrong for doing this.
>
> * * *
>
> [I] had no intention of disrupting any company workflow or day to day activity. Although it may appear that my actions were of mal intent, I only wanted to collect the intellectual property that belonged to me.

(Doc. 43, Ex. C.) The Government argues that these statements boldly contradict Defendant's assertion of innocence.

## C.   Evidentiary Hearing

A hearing was held on Defendant's motion to withdraw his guilty plea on September 11, 2014. At the hearing, Defendant first called Dr. Verma, who testified that it was not until Defendant's fiancee, Rebecca Plank, accompanied Defendant to an appointment that he was able to gain a better understanding of Defendant's mental state, which led to his diagnosing Defendant with Bipolar II Disorder. Ms. Plank revealed to Dr. Verma that Defendant was very anxious and irritable and that he experienced mood swings with hypomania. While Defendant was usually a "very depressed type," at times, he was full of energy and would talk excessively, drive recklessly, and become very passionate and angry. He would also become overproductive and buy large computer components. Following these hypomanic episodes, he would return to a depressive state.

Dr. Verma testified that there are two types of bipolar disorder: Bipolar I and Bipolar II. Bipolar II is the less severe form of bipolar and typically involves episodes of hypomania followed by severe depression. When asked by defense counsel if Bipolar II can affect judgment, Dr. Verma responded that it may, and noted that, in Defendant's case, it caused him to overspend and drive recklessly. When asked if one of the symptoms of Bipolar II is "demonstration of poor judgment," Dr. Verma answered, "Yes, it can happen, yes." Dr. Verma further testified that, in light of Defendant's subsequent Bipolar II diagnosis, it was probable that Defendant suffered from the disorder at the time of his guilty plea. When asked if individuals with Bipolar II can make poor decisions with little regard for the consequences, Dr. Verma responded, "Yes, it can happen."

Upon cross-examination, the Government directed Dr. Verma to some of the impressions he noted of Defendant in his medical records. Dr. Verma confirmed that he consistently reported that Defendant appeared to be of average intelligence, demonstrated no significant memory problems with immediate or delayed recall, appeared to have good judgment and good insight, did a good job with accepting ownership of behavioral functioning, and had a higher than average motivation for treatment. Dr. Verma also agreed that, prior to being treated for Bipolar II, Defendant was able to exercise professional judgment in the workplace.

Dr. Verma further testified that Defendant reported being highly anxious as a result of his arrest by the FBI. Following his plea deal, Defendant complained "many times" that his lawyer had not shared certain discovery material with him until the last moment. Dr. Verma testified that Defendant's discussions regarding these legal issues seemed coherent, thoughtful, and appropriate under the

12

circumstances. When asked if he saw symptoms of manic depressive disorder at that time, Dr. Verma responded that he did not see any signs of hypomania until he met with Ms. Plank. He further explained that the hypomania associated with Bipolar II is less severe than the mania associated with Bipolar I. However, the depression is the same with both Bipolar I and II. Finally, Dr. Verma could not state whether Defendant was in either a depressive or manic state in or around the time he entered his guilty plea.

The defense next called Ms. Plank to testify on Defendant's behalf. Ms. Plank testified that she had been with Defendant for over eleven years and lived with him for the duration. She recounted first developing concerns regarding his mental stability in 2008 or 2009, while they were in college and he began working for the Business. Later, when he received a target letter from the Government in 2011, regarding the instant action, he became very distraught and irritable, and was unable to control his emotions. In 2012, he began seeing Dr. Verma to address these issues, and, in October 2013, Defendant invited her to accompany him to an appointment. At that appointment, she reported to Dr. Verma that Defendant did not sleep well and that he experienced episodes of hypomania, during which he became extremely passionate and full of energy, talked excessively, had racing thoughts, and became overproductive. He also experienced depressive episodes with all the classic signs and symptoms of depression. Ms. Plank testified that she began observing these signs and symptoms toward the beginning of their relationship.

Ms. Plank further testified that, in the month leading up to the plea hearing, Defendant "was highly anxious, irritable, very difficult to be around, [and] very moody." He was also very distraught about the Government's discovery and

13

was not able to focus on what he was there to do. She stated that, "It was as if he was just walking into tell the court what [his attorney] guided him in there to do."

Following Defendant's Bipolar II diagnosis, Ms. Plank observed that his symptoms started to decline to a degree, "[b]ut he still ha[d] the same symptoms that come in cycles and they are repetitive and there are certain triggers that could bring out any given symptom." However, the medication has helped with his mental clarity and enabled him to better process information.

Upon cross-examination, Ms. Plank testified that, a few days after receiving the Government's proposed plea offer, she and Defendant reviewed the plea agreement with his counsel for approximately six hours, but that the averments contained therein were not clearly discussed. She stated that, although Defendant admits to entering the system, he did not tamper with the network or cause any harm.

At the close of the hearing, defense counsel argued, inter alia, that he had presented credible evidence to support Defendant's contention that he was suffering from undiagnosed and untreated Bipolar II Disorder at the time he considered and entered his plea. Despite being represented by competent counsel at the time, given the time constraints surrounding the plea deal and his mental state, Defendant would not have been able to clearly understand and rationally decide whether he should enter a plea. As to Defendant's assertion of innocence, defense counsel argued that Defendant lacked the requisite intent to cause damage to the system.

In response, the Government argued that Defendant admitted to each element of the crime during the guilty plea proceeding as well as in his statements to

the FBI. Further, there is no evidence to indicate that Defendant was in a manic or depressive episode at the time of the guilty plea proceeding, or that his ability to enter a knowing and voluntary plea was impacted by his mental state.

## II.          **Legal Standard**

Under Federal Rule of Criminal Procedure 11(d)(2)(B), a defendant must demonstrate a "fair and just reason" to withdraw his guilty plea after it has been accepted by the court. The relevant factors for determining if the withdrawal of the guilty plea is fair and just are: "(1) whether the defendant asserts his innocence; (2) the strength of the defendant's reasons for withdrawing the plea; and (3) whether the government would be prejudiced by the withdrawal." *United States v. Jones*, 336 F.3d 245, 252 (3d Cir. 2003). "This analysis requires that a district court consider each factor, but critically, does not make any one mandatory such that failure to establish one will necessarily dictate rejection of the motion." *United States v. Wilder*, 134 F. App'x 527, 528 (3d Cir. 2005).

Although motions to withdraw guilty pleas made before sentencing should be freely granted, *Government of V.I. v. Berry*, 631 F.2d 214, 219 (3d Cir. 1980), this rule of liberal construction is circumscribed by the substantial burden a defendant carries to demonstrate a fair and just reason for the withdrawal, *Jones*, 336 F.3d at 252. The defendant's heavy burden reflects the notion that, "[o]nce accepted, a guilty plea may not automatically be withdrawn at the defendant's whim." *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001); *see also United States v. Hyde*, 520 U.S. 620, 676 (1997) ("After the defendant has sworn in open court that he actually committed the crimes, after he has stated that he is pleading

guilty because he is guilty, after the court has found a factual basis for the plea, and after the court has explicitly announced that it accepts the plea, [the defendant cannot] withdraw a guilty plea simply on a lark."). "A shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty." *Brown*, 250 F.3d at 815.

## III.     Discussion

Defendant's motion to withdraw his guilty plea rests primarily on his claim that he did not knowingly and voluntarily enter into the plea because he was suffering from untreated and undiagnosed Bipolar II Disorder at the time he changed his plea. In addition, Defendant claims that he is innocent of the charge and that the Government would not be prejudiced by a withdrawal of his plea. The court has considered each of Defendant's arguments and concludes that Defendant has not shown a fair and just reason to withdraw his guilty plea.

### A.     Assertion of Innocence

The first factor to consider for the withdrawal of a guilty plea under Rule 11(d)(2)(B) is whether the defendant asserts his innocence. "Bald assertions of innocence, however, are insufficient to permit a defendant to withdraw [his] guilty plea." *Brown*, 250 F.3d at 818. Rather, "'[a]ssertions of innocence must be buttressed by facts in the record that support a claimed defense.'" *Id.* Further, the defendant must "give sufficient reasons to explain why contradictory positions were taken before the district court and why permission should be given to withdraw the guilty plea." *Jones*, 336 F.3d at 253.

Notwithstanding his pleading guilty, Plaintiff now asserts that he did
not violate 18 U.S.C. § 1030(a)(5)(A), which requires proof that the defendant:

> knowingly cause[d] the transmission of a program,
> information, code, or command, and as a result of such
> conduct, intentionally cause[d] damage without
> authorization, to a protected computer.

18 U.S.C. § 1030(a)(5)(A). Defendant admits that he knowingly entered commands
into a protected computer, thus satisfying the first clause of the section. Defendant
disputes, however, that his admissions to the Government are sufficient to establish
that he intentionally caused damage to the computer. Pursuant to the statutory
definition, it is clear that they do. Section 1030(e)(8) defines "damage" very broadly
as "*any* impairment to the integrity or availability of data, a program, a system, or
information." 18 U.S.C. § 1030(e)(8) (emphasis added). Although the statute itself
does not define "intentionally," the Third Circuit has defined it in the criminal
context "as performing an act deliberately and not by accident." *United States v.
Carlson*, 209 F. App'x 181, 184 (3d Cir. 2006) (citing *United State v. Barbosa*, 271
F.3d 438 (3d Cir. 2001)).

In his first statement to the FBI, Plaintiff admitted that, following the
termination of his employment, he accessed numerous servers of the Business to
retrieve and copy scripts that he had written and stored on the servers. (Doc. 43, Ex.
A.) After locating and copying the scripts from the server to his computer, he ran
the commands "rm .history_bash" and "rm history.c" to delete the record of the
commands he had just executed on the system. (*Id.*) He also installed a web based
notepad and created a "CRON job script" to continuously delete all log files. (*Id.*)
In his handwritten statement, Defendant admitted that he "gained unauthorized
access to many of the company servers and issued commands to the servers to stop

17

logging functions and delete log files . . . to cover up the fact that [he] gained unauthorized access . . . ." (Doc. 43, Ex. C.) At the change of plea hearing, Defendant agreed with the offense conduct as set forth therein by the Government, including that he had erased scripts or codes from the system, and that, upon learning of the Business' system outage, he refused to disclose certain codes that would assist the Business in restoring the system until such time as the Business returned certain scripts and/or software programs which he believed belonged to him. (Doc. 40, p. 10 of 15.) During the colloquy, Defendant admitted to accessing the Business' computer network and to "delet[ing] certain log files . . . ." (*Id.* at p. 12 of 15.)

In light of the broad definition of damage, Defendant's own admissions are sufficient to establish the requisite intent to cause damage necessary for the charge. The servers Defendant accessed were designed to permit the Business to retrace any entry into its system. Defendant deliberately entered the "rm .history_bash" and "rm history.c" commands and created the CRON job script to destroy any record of his having accessed the servers, thus impairing the availability of the data. That his deliberate deletion of this history was done with the purpose of concealing his access rather than causing the system to malfunction or pecuniary harm is not dispositive to whether Defendant intended to cause damage as defined be the statute and case law. Clearly, he admitted that he deleted information owned by the Business, thereby compromising the integrity of the server and the availability of data stored therein. Accordingly, the court concludes that Defendant has failed to adequately assert his innocence. This factor weighs against permitting him to withdraw his plea.

### B.   Strength of Defendant's Reason to Withdraw the Plea

Defendant's contention that his guilty plea was not knowing and voluntary is analyzed under the second factor, *i.e.*, the strength of the defendant's reason for seeking to withdraw his plea.  By entering a plea of guilty, a criminal defendant waives his constitutional rights to be tried by a jury, to confront his accusers, and to exercise his privilege against self-incrimination. *United States v. Lessner*, 498 F.3d 185, 192 (3d Cir. 2007) (citing *Parke v. Raley*, 506 U.S. 20, 29 (1992)).  Like all waivers of constitutional rights, in order for a guilty plea to be valid, it must be made "voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" *Id.* (quoting *Bradshaw v. Stumf*, 545 U.S. 175, 183 (2005)).  "A waiver is knowing and intelligent 'if the defendant understands the nature of the right and how it would likely apply *in general* in the circumstances . . . , and it is voluntary if it represents 'the expression of his own choice.'" *United States v. Furesz*, 498 F. App'x 178, 180 (3d Cir. 2012) (emphasis in original) (internal citations omitted).  If a defendant can "present evidence that his mental state on the day of his plea hearing prevented him from knowingly and voluntarily changing his plea, he would have presented a strong reason for withdrawing that plea." *United States v. Hopson*, 250 F. App'x 502, 505 (3d Cir. 2007).

Aside from the evidence that Defendant was subsequently diagnosed with Bipolar II Disorder, Defendant presented no evidence that indicated he was incompetent to plead guilty on February 17, 2014.  Even assuming, as the evidence supports, that Defendant had Bipolar II during the relevant time period, there is no indication whatsoever that he was in a hypomanic or depressive state such that his

19

ability to understand the circumstances and likely consequences of his plea was impaired. Even assuming that he was hypomanic in the weeks and months leading up to his plea, the testimony failed to establish a credible basis to find that Defendant's Bipolar II affected his judgment. Indeed, Dr. Verma's testimony in this regard was limited to generalizations of possible symptoms of Bipolar II, indicating that the disorder "can" affect one's judgment and that the symptoms "can" manifest themselves in poor judgement or poor decision-making. This speculative testimony falls far short of the threshold necessary to permit the withdrawal of a guilty plea, especially in light of the medical records wherein Dr. Verma repeatedly noted that Defendant "appear[ed] to have good judgment . . . [and] insight[,] and [did] a good job accepting ownership of behavioral functioning" (*see, e.g.*, Doc. 39-1, pp. 4, 8-9 of 17), and by the fact that Defendant was, at all times relevant hereto, a functioning, employed individual.

Further, during the change of plea proceeding, the court gave Defendant a comprehensive guilty plea colloquy, wherein the court inquired into Defendant's mental health history. It asked whether the medications he was taking affected his ability to understand the proceedings, and posed several follow-up questions to elicit further information. The court also described the nature and basis of the charge to which Defendant was pleading guilty and the concomitant waiver of constitutional rights. It also advised Defendant of the maximum term of imprisonment and fine he faced. The court was satisfied that his answers to its questions were responsive, and that his conduct and demeanor throughout the change of plea hearing amply demonstrated that he knowingly and voluntarily entered his plea.

For all these reasons, the court finds that there is no evidence indicating that Defendant did not knowingly, voluntarily, or competently plead guilty on February 17, 2013. Therefore, Defendant has failed to show a fair and just reason for withdrawing his plea.

### C.    Prejudice to the Government

If Defendant had succeeded in establishing a fair and just reason for withdrawing his guilty plea, the burden would shift to the government to show that it would be prejudiced by the withdrawal. However, the Third Circuit has made clear that the government is not required to show prejudice when a defendant has failed to provide sufficient grounds for permitting withdrawal of the plea. *See, e.g., United States v. Martinez*, 785 F.2d 111, 116 (3d Cir. 1986). Accordingly, the court will decline to consider the third factor.

### IV.    Conclusion

For the reasons set forth above, the court finds that Defendant has not established a fair and just reason for withdrawing his guilty plea, and will therefore deny his motion.

An appropriate order will be entered.


SYLVIA H. RAMBO
United States District Judge

Dated: September  22 , 2014.

21