AO 245B (Rev. 11/16)    Judgment in a Criminal Case
                        Sheet 1

# UNITED STATES DISTRICT COURT

Middle District of Pennsylvania

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| DARIUSZ A. PRUGAR | Case Number: 1:12-CR-0267-01 |
| | USM Number: 70853-067 |
| | Royce Morris, Esquire |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)    1-2 of the Indictment
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 1030(a)(5)(A) | Intentional Damage to a Protected Computer | 7/31/2010 | -1- |
| 18 USC § 1343 | Wire Fraud | 7/31/2010 | -2- |
| | | | |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)    3 of the Indictment

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

11/29/2016
Date of Imposition of Judgment

S/Sylvia H. Rambo
Signature of Judge

Sylvia H. Rambo, United States District Judge
Name and Title of Judge

11/30/2016
Date

AO 245B (Rev. 11/16)   Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___2___ of ___7___

DEFENDANT:  DARIUSZ A. PRUGAR
CASE NUMBER:  1:12-CR-0267-01

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Twenty Four (24) months. This term consists of a term of 24 months imprisonment on each of Counts 1 and 2 to run concurrently.

☐   The court makes the following recommendations to the Bureau of Prisons:

Placement at FCI Allenwood Low and that the Bureau of Prisons provide the defendant with mental health counseling while incarcerated.

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____   ☐ a.m.   ☐ p.m.   on _____ .

    ☐   as notified by the United States Marshal.

☑   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑   before 2 p.m. on ___12/27/2016_____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
        Sheet 3 — Supervised Release

Judgment—Page  3  of  7

DEFENDANT:   DARIUSZ A. PRUGAR
CASE NUMBER:   1:12-CR-0267-01

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :
  Three (3) years. This term consists of a three year term of supervised release on each of Counts 1 and 2 to run concurrently

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page __4__ of __7__

DEFENDANT:  DARIUSZ A. PRUGAR
CASE NUMBER:  1:12-CR-0267-01

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____    Date  _____

AO 245B (Rev. 11/16)    Judgment in a Criminal Case
                        Sheet 3B — Supervised Release

Judgment—Page ___5___ of ____7____

DEFENDANT:   DARIUSZ A. PRUGAR
CASE NUMBER:   1:12-CR-0267-01

# ADDITIONAL SUPERVISED RELEASE TERMS

1. The defendant shall submit to one drug test within 15 days of commencing supervision and at least two periodic drug tests thereafter for use of a controlled substance;

2. The defendant shall undergo a mental health evaluation and, if recommended, the defendant shall satisfactorily complete a program of outpatient or inpatient mental health treatment;

3. The defendant shall comply with the terms and conditions set forth in the Computer Monitoring/Filtering Participant Agreement for the Middle District of Pennsylvania, and shall pay the costs of the computer monitoring/filtering program, not to exceed the monthly contractual rate, in accordance with the probation officer's instructions;

4. The defendant shall submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by the United States probation officer. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.

5. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment schedule for payment of restitution or special assessment;

6. The defendant shall provide the probation officer with access to any requested financial information;

7. The defendant shall apply all monies received from income tax refunds, lottery winnings, judgments, and/or other anticipated or unexpected financial gains to the outstanding court ordered financial obligation;

8. The defendant shall cooperate in the collection of a DNA sample as directed by the probation officer, unless a sample was collected during imprisonment;

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page __6__ of __7__

DEFENDANT: DARIUSZ A. PRUGAR
CASE NUMBER: 1:12-CR-0267-01

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ 0.00 | $ 26,942.86 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |
| Selective Insurance | $25,000.00 | $25,000.00 |  |
| Fetrow Electric Service | $1,942.86 | $1,942.86 |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**TOTALS**   $ _____   $ _____

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the   ☐ fine  ☑ restitution.

☐ the interest requirement for the   ☐ fine  ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 11/16)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __7__ of __7__

DEFENDANT:  DARIUSZ A. PRUGAR
CASE NUMBER:  1:12-CR-0267-01

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☑ Lump sum payment of $ __200.00__ due immediately, balance due

     ☐ not later than _____ , or
     ☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☑ Special instructions regarding the payment of criminal monetary penalties:

     During the term of imprisonment, the restitution is payable every three months in an amount, after a telephone allowance, equal to 50 percent of the funds deposited into the defendant's inmate trust fund account. In the event the restitution is not paid in full prior to the commencement of supervised release, the defendant shall, as a condition of supervised release, satisfy the amount due in monthly installments of no less than $100.00, to commence thirty (30) days after release from confinement.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

     Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

*U.S. v. Dariusz Prugar*
**1:12-cr-267**
**Sentencing Considerations**

I.    **LOSS AMOUNT**

   a.  **Lost Revenue**

      i.  PSR Calculation: Total Loss in Revenue: $144,000

         1.  According to the PSR, Netrepid suffered a "$12,000 to
             $15,000 decrease in customer revenue per month in the
             year or more following the interruption" with a total loss
             in revenue of $144,000. (PSR ¶ 41.)

      ii.  Government's Supporting Exhibits

         1.  Trial Ex. 8 & Sentencing Hearing Ex. 3

         2.  Both exhibits include a small snapshot of figures
             provided by Sam Coyle with absolutely no evidentiary
             support

         3.  Exhibit 3 was prepared on June 27, 2012, which was two
             years after the crash. While there is no date on Exhibit 8,
             it is presumed that Exhibit 8 was created for purposes of
             the April 22, 2015 sentencing hearing. Despite the
             significant passage of time since the crash, Sam Coyle
             failed to provide any financial statements or tax
             documents to support his assertions of loss.

         4.  Strikingly, the two exhibits provide contradictory net
             revenue figures:

**Net Revenue Figures**

|           | **Exhibit 3** | **Exhibit 8** |
|-----------|---------------|---------------|
| May 2010  | $75,412.00    | $76,829.72    |
| June 2010 | $71,689.00    | $71,145.87    |
| July 2010 | $69,479.00    | $64,321.85    |
| Aug. 2010 | $70,683.00    | $62,261.03    |

| Sept. 2010 | $63,169.00 | $60,543.09 |
| Oct. 2010 | $63,979.00 | $56,710.01 |

TOTALS:      $414,411.00        $391,811.57

5. By 2016, Coyle would have knowledge and supporting documents of any actual loss in revenue that his company sustained from October 2010 forward and would not need to rely on estimates. A continued omission of this information may demonstrate that no such loss in revenue occurred and certainly fails to meet the Government's burden to prove this loss by a preponderance of the evidence.

iii. In addition, this loss in revenue is an estimate based almost entirely on lost business or a loss of goodwill. It does not appear that those losses are applicable to these loss calculations. *See Eagle v. Morgan*, Civ. No. 11-cv-4303, 2011 WL 6739448, *8 (E.D. Pa. Dec. 22, 2011).

iv. Bottom Line: The court should decline to "allow such speculative estimates to be included in the loss calculation." *United States v. Nosal*, Crim. No. 08-237, 2014 WL 121519, *7(citing *United States v. Dominguez*, 109 F.3d 675, 676 (11ᵗʰ Cir. 1997) (the district court "must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines.")

v. Findings Supported by Credible Evidence

1. Total Loss in Revenue: $0.00

b. **Repair Costs**

i. PSR Calculation: $43,337.25 of which $25,000 was reimbursed by Selective Insurance

1. According to the PSR, "Netrepid spent $43,337.51 to repair the damage done to the system of which $25,000 was reimbursed by Selective Insurance." This calculation

is based on Sentencing Ex. 3, which is an email from Coyle to the Government written two years after the crash wherein Coyle outlines his invoices (totaling $24,737.51) and provides a "total for completing work" "left to be done" of $18,600.

2. While Coyle's breakdown of invoices totals $24,737.51, the invoices included as support only credibly total $15,256.64.

    a. There is no invoice provided from Acronis for $5,409.00

    b. $500 for the same charge appears on two Billmax statements

    c. It is undisputed that the $2,417.87 invoice from Dell for memory was unrelated to the intrusion on the network

    d. There is no invoice provided from CTI Networks for $1,100

3. The PSR has included an additional $18,600 of repair costs that appear to come from Coyle's email. In his email, he states that "[t]here is still substantial work left to be done on our network side" and estimates those costs at $18,600. However, this email was written two years after the crash. The same estimate was provided to NICE Network (the insurance company) on November 1, 2010. (Trial Ex. 21.) As the insurance company indicated in 2010, actual repair invoices for these repairs should be available and verified to ascertain the actual costs.

  ii. Findings Supported by Credible Evidence

    1. Invoices (Sent. Ex. 3)

| | | |
|---|---|---|
| Appalachia | 7/14/10 | $7,140.00 |
| Appalachia | 8/12/10 | $4,340.00 |
| BillMax | 7/3/10 | $1,100.00 |
| BillMax | 7/9/10 | $1,140.00 |
| Summit Tech. | 7/20/10 | $2,471.87 |
| mailEnable | 7/13/10 | $388.23 |
| mailEnable | 7/13/10 | $349.41 |

| reNow Digital | 8/10/10 | $799.00 |
|---|---|---|

TOTAL:                                    $15,256.64

2. However, Selective Insurance paid $25,000 and should be reimbursed.

3. Total loss due to repairs: $25,000

## c. Losses Suffered by Customers

   i. PSR Calculation: $28,251.73

   1. According the the PSR, "[c]ustomers of Netrepid indicated that they experienced losses of $28,251.73."

   2. Customers:

       a. Bobby Gerhart Racing – no request for restitution
       b. Nancy Lieder – no request for restitution
       c. Laura Silsbee – requesting $450
           i. No supporting documentation
       d. Alternatives in Healthcare Management – requesting $2,000
           i. No supporting documentation
       e. Vick's Electric – requesting $991.87
           i. He is claiming his computer repair costs incurred on 6/28/10 and 7/2/10. However, an internet outage would not necessitate computer repair. The supporting document is also very weak.
       f. Fetrow Electric – requesting $23,200.86
           i. According to the year end statement, this is a company that had a gross income of $750,932.98 in 2010 but a net income of $50,514.53. They had a lot of monthly expenses. In the three weeks surrounding Prugar's intrusion, they had a lower than average net income (24k versus 43k). However, they provide no explanation as to

how the internet disruption contributed to that loss of income and then proceed to attribute their total loss to the outage, despite the fact that they had some expenses that month that were notably higher than average. They do not attempt to apportion their loss between ordinary business losses and those resulting from an internet outage.

ii. The loss figure represents losses occurring between June 20th and July 10th. However, Government's trial exhibit 9 shows that the outage only occurred from June 28th to July 2nd.

iii. Significantly, in addition to stating that their total loss in that three week period was attributable to this event, they also include an additional $2,410.60. They calculate this by taking their weekly average profit, dividing it by 50 weeks and multiplying it by 2 for a 2 week disruption. While their math is incorrect, this particular loss estimate is certainly more compelling than their attempt to attribute the entire loss they suffered that month to him. Done correctly, the calculation is as follows:

1. Net profit of 50,514.53/52 weeks = 971.43
2. 2 week disruption x 971.43 = $1,942.86.

iv. However, their attempt to take two bites out of the apple takes away some credibility.

g. Leisure Lanes – requesting $1,309
   i. No supporting documentation

h. Ronald McDonald House – requesting $300
   i. They state that the computer was confiscated as evidence. However, application note 3(D)(ii) excludes from the loss calculation "costs to the government of, and costs incurred by victims primarily to aid the

government in, the prosecution and criminal investigation of an offense."

    ii.  Findings Supported by Credible Evidence

        1.  Customer Losses – Nearly all of the loss estimates provided by the customers are far too general for the court to reasonably determine if they are cognizable as a loss for purposes of the Guidelines calculation. Consequently, the following loss calculations seem supportable:
            a.  Bobby Gerhart Racing – $0
            b.  Nancy Lieder – $0
            c.  Laura Silsbee – $0
            d.  Alternatives in Healthcare Management – $0
            e.  Vick's Electric – $0
            f.  Fetrow Electric – $1,942.86
            g.  Leisure Lane
            h.  Leisure Lane – $0
            i.  Ronald McDonald House – $0

        2.  Total Customer Losses: $1,942.86

**d. Total Loss**

    i.  PSR: $215,589.24
    ii.  Reasonable estimate based on the Government's submissions: $26,942.86
    iii.  Pursuant to § 2B1.1(b)(1)(F), based on $26,942.86  in loss, a 4-level increase applies because the loss amount was more than $15,000 but less than $40,000

**II.  NUMBER OF VICTIMS**

    a.  The probation office applied a 2-level increase pursuant to § 2B1.1(b)(2)(A) because the offense involved 10 or more victims or resulted in substantial financial hardship to one or more victims.
    b.  The application notes define a "victim" as (A) any person who sustained any part of the actual loss determined under subsection

(b)(1); or (B) any individual who sustained bodily injury as a result of the offense.

c. The application notes provide that, "[i]n determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim --

    i. becoming insolvent
    ii. filing for bankruptcy . . .
    iii. suffering substantial loss of a retirement, education, or other savings or investment fund;
    iv. making substantial changes to his or her employment, such as postponing his or her retirement plans;
    v. making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and
    vi. suffering substantial harm to his or her ability to obtain credit."

d. It appears that the PSR identifies the following 11 victims:

    i. Netrepid
    ii. Selective Insurance
    iii. Bobby Gearhart Racing
    iv. Nancy Lieder
    v. Laura Silsbee – $0
    vi. Alternatives in Healthcare Management – $0
    vii. Vick's Electric – $0
    viii. Fetrow Electric – $1,942.86
    ix. Leisure Lane
    x. Leisure Lane – $0
    xi. Ronald McDonald House – $0

e. Based on the above definitions, it seems that Netrepid, Selective Insurance and Fetrow Electric are victims. Because that is not enough to meet the enhancement for 10 or more victims, one of these victims would have had to suffer substantial financial hardship for the enhancement to apply.

## III.   SOPHISTICTED MEANS ENHANCEMENT

a. According to the application notes, "'sophisticated means'" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."

b. See attached opinions

c. For example, as one district court explained, "[t]he guideline is clear: It is not enough for the means used in a scheme to be "complex" or "intricate"; rather, the means must be "especially" so. The definition of "especially" includes "exceptionally" and "particularly." Webster's Third New International Dictionary (1986). That is, the level of complexity or intricacy must set that particular scheme apart from ordinary schemes, and even ordinarily complex or intricate schemes." *United States v. Hulse*, 989 F. Supp. 2d 1224, 1226 (M.D. Ala. 2013).

d. The enhancement only applies when "the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense." *United States v. Sheneman*, 682 F.3d 623, 632 (7th Cir. 2012) (quoting *United States v. Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009)).

e. Prugar is accused of logging into the computer system using his own username and password on just one occasion hours after he was fired.

f. Unlike most instances of this type of unauthorized entry, he did not find a way to hack into an unfamiliar network. This was the network he built and worked on every day. His password had not been changed so he was able to easily access the network.

g. In order to conceal his unauthorized entry, Prugar entered certain codes that seem complex to us but that are familiar to people in the industry. Indeed, according to trial testimony, his coworkers quickly diagnosed the problem and figured out what he had done. It did not take an expert to diagnose.

h. While he did attempt to conceal his entry, concealment is an aspect of all fraud cases. His actions do not rise to the level of "especially" complex or intricate.

## IV.   CRITICAL INFRASTRUCTURE ENHANCEMENT

a. Pursuant to § 2B1.1(b)(18)(A)(iii), the probation officer applied a 6-level enhancement for a substantial disruption of critical infrastructure.

b. At a minimum, the guidelines require a 4-level increase because the defendant was convicted of an offense under 18 U.S.C. § 1030(a)(5)(A).

c. According to the application notes, "[c]ritical infrastructure means systems and assets vital to national defense, national security, economic security, public health or safety, or any combination of those matters. A critical infrastructure may be publicly or privately

owned. Examples of critical infrastructures include . . . telecommunications networks."

d. In its sentencing memorandum from April 21, 2015, the Government seems to concede that the additional 2-level enhancement for a substantial disruption to a critical infrastructure may not apply. (Doc. 61, pp. 7-8.) Consiglio also expressed doubt as to whether it applies at the sentencing hearing. (Doc. 65, pp.176-78.)

V.   **OFFENSE LEVEL COMPUTATION**

|   |   |   |
|---|---|---|
| **a.** | Base Offense Level | 7 |
| **b.** | Loss Amount | 4 |
| **c.** | Victims | 0 |
| **d.** | Sophisticated Means | 0 |
| **e.** | Critical Infrastructure | 4 |
| f. | Adjusted Offense Level | 15 |
| g. | Acceptance of Responsibility | 0 |
| h. | Total Offense Level | 15 |

Guideline Range 18-24 Months